UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHRISTIAN TENNANT CUSTOM
HOMES OF FLORIDA, INC.,

      Plaintiff,

v.                                   Case No. 3:15-cv-585-MCR-CJK

EBSCO GULF COAST
DEVELOPMENT, INC. and
JAMES COMER,

      Defendants.
_____/

## ORDER

Plaintiff Christian Tennant Custom Homes of Florida, Inc. ("CTCHFL") has sued Defendant James Comer ("Comer") and Defendant EBSCO Gulf Coast Development, Inc. ("EBSCO") for tortious interference with a business relationship and additionally EBSCO for breach of contract, breach of an implied contract, and promissory estoppel.[1] ECF No. 25. Pending before the Court is Defendants' Motion for Summary Judgment, together with a Motion to Strike paragraphs 13, 19, 20, and 24 of Christian Tennant's Declaration, ECF Nos. 33, 46. Having carefully

---

[1] Previously, the Court dismissed with prejudice CTCHFL's negligence claims and an additional tortious interference with a business relationship claim against Comer and EBSCO. ECF No. 28.

considered the motions, the Court finds that both motions are due to be granted in part and denied in part.[2]

## BACKGROUND[3]

Plaintiff CTCHFL is Florida Corporation with offices in Walton County, Florida. ECF No. 47-1 at 1-2. Christian Tennant ("Tennant") is the President of CTCHFL. Tennant has 26 years of experience in homebuilding.[4] ECF No. 37-1 at 3 (Dep. At 7); ECF No. 47-1 at 1. Defendant EBSCO is the developer of Alys Beach, a private residential community in Walton County that is governed by a Declaration of Covenants, Conditions and Restrictions ("Declaration of Covenants"). The

---

[2] Defendants argue in their Reply Memorandum Regarding Motion for Summary Judgment that the Court may accept Defendants' factual statements in their Motion for Summary Judgment as undisputed because Plaintiff has failed to explicitly respond to them as required by Local Rule 56.1(c). While this is true, Plaintiff has disputed many of the factual statements in its Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. In addition, the Court has discretion under Rule 56(e) of the Federal Rules of Civil Procedure to (1) give CTCHFL an opportunity to properly support or address a fact, (2) consider facts undisputed for purposes of the motion, (3) grant summary judgment, or (4) issue any other appropriate order. To the extent Plaintiff has disputed on the record the material factual statements in Defendants' Motion for Summary Judgment, the Court will consider those facts disputed.

[3] For the limited purposes of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).

[4] For purposes of this order, Christian Tennant's knowledge of the facts is imputed to CTCHFL because he is the President of CTCHFL. Similarly, Jason Comer's knowledge of the facts is imputed to EBSCO because he served as the Vice President of EBSCO during the years relevant to this case. *See In re Spear & Jackson Securities Litigation*, 399 F. Supp. 2d 1350, 1361 (S.D. Fla. 2005) ("knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation") (citing *American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 270-271 (5th Cir .1981)).

Declaration of Covenants is intended to govern the rights and obligations between EBSCO and lot owners in Alys Beach. ECF No. 37-3 at 58. Under the terms of the Declaration of Covenants, only certain approved builders may be hired by lot owners to construct homes within the community. *Id.* at 65. Defendant Jason Comer was the Vice President of EBSCO from 2005 until October 1, 2012 and remains a member of EBSCO's board. ECF No. 34-1 at 2. In 2005, CTCHFL was placed on the list of approved builders for Alys Beach. *Id.* at 6; ECF No. 36-2 at 21 (Ex. 6). EBSCO sent a letter to CTCHFL on October 14, 2005 welcoming CTCHFL to the approved builders list and including a copy of the Alys Beach Design Code. ECF 36-2 at 21 (Ex. 6). On November 16, 2006, EBSCO sent another letter to CTCHFL requesting $75 to cover the cost of creating a portfolio binder to display CTCHFL's work to prospective clients. ECF 36-2 at 22 (Ex. 7).

According to the Declaration of Tennant, CTCHFL understood that as a condition of being on the approved builders list, it "was obligated to advertise, promote and offer residential construction services in Alys Beach in exchange for its right to remain on the approved builder [list] subject to removal only for cause related to poor construction performance." ECF No. 47-1 at 2. By deposition, Tennant testified that CTCHFL's inclusion on the approved builders list implied that it was obligated to provide residential construction services in Alys Beach. ECF 37-1 at 26 (Dep. at 97). However, the record reflects that neither the October 14, 2005

nor November 16, 2006 letter from EBSCO to CTCHFL, which welcomed CTCHFL to the approved builders list, explicitly obligated it to offer residential construction services in Alys Beach. *See* ECF 36-2 at 21-22 (Exs. 6, 7).

Tennant further testified that the Declaration of Covenants implies that CTCHFL would remain on the approved builders list indefinitely. ECF No. 37-1 at 20 (Dep. at 74-76). Although the Declaration of Covenants does not contain language obligating CTCHFL to "advertise, promote, and offer residential construction services in Alys Beach", *see* ECF No. 37-3, Ex. 44, at the time CTCHFL was approved, the Declaration of Covenants did contain standards of approval stating that a builder could be removed from the list for failing to comply with Alys Beach's rules. However, Tennant admitted that no representative of EBSCO promised that CTCHFL would remain on the approved builders list forever and acknowledged that CTCHFL could also "remove itself from the Approved Builder List at any time and for any reason." ECF No. 33 at 4; ECF No. 37-1 at 22, 26 (Dep. at 82, 98).

In December 2010, CTCHFL entered into negotiations with Elton and Leslie Stephens (collectively, "the Stephenses") for the construction of a single-family beach home to be built near Alys Beach ("Stephens's Home"), but outside the

technical boundaries of the development."[5]  ECF No. 37-2 at 36-37 (Dep. at 253-254); ECF No. 37-3, Ex. 38.   Plaintiff's preliminary communications with Elton Stephens ("Stephens") were via email. ECF No. 37-3, Exs. 38, 39.  In June 2011, Stephens informed Comer that he had decided to use CTCHFL as his builder. ECF No. 35-1 at 3-4.[6]  On June 16, 2011, Stephens sent an email to Tennant with the subject "TEAM MEETING" requesting Tennant to attend a meeting at Stephens's house on July 12, 2011.  ECF No. 37-3, Ex. 40.  Gary Justiss, Stephens's architect, Alys Protzman, Stephens's interior designer, and Leslie Stephens, his wife, were copied on the email and attended the meeting with Tennant.  *Id.*; ECF 37-2 at 39 (Dep. at 263).   On July 13, 2011, Tennant emailed Stephens a contract for CTCHFL's construction services. ECF No. 37-2 at 41 (Dep. at 271); ECF No. 37-3, Exs. 41, 43.  Stephens notified Tennant on July 14, 2011 that he would not be able to review the contract until after August 3rd because he was traveling but hoped "WE GET THE DAMN PERMIT."  ECF No. 37-3, Ex. 41.  As of August 16, 2011, the Stephenses had not signed the contract, ECF 37-2 at 41 (Dep. at 271), but nonetheless on that date CTCHFL was involved in preliminary discussions with the engineers and architects regarding permitting and surveying via email.  ECF 37-2 at

---

[5] Elton Stephens is Jason Comer's uncle.

[6] Stephens also states that "Although I was seriously considering hiring Mr. Tennant's company to build the beach house, no such final decision had been reached by August 2011. I did not intend to make any such decision until much later in the process, probably during 2012."

37 (Dep. at 256); ECF No. 37-3, Ex. 42. Stephens was copied on the August 16, 2011 email between Tennant, Steve Neace, an engineer at Anderson Engineers P.A., Gary Justiss, and Rebecca Lussier regarding timing for DEP processes, construction drawings, and whether CTCHFL could assist in the process. ECF No. 37-3, Ex. 42.

Comer "was aware during the summer of 2011 that Mr. Stephens was in discussions with [CTCHFL] to construct his beach house" and that Stephens was interested in working with a builder that was approved to build in Alys Beach. ECF No. 34-1 at 8. Around the same time, relationships between EBSCO and Tennant were strained. ECF 37-1 at 51. Previously, but during the time of CTCHFL's tenure on the approved builders list, the town architects at Alys Beach had accused Tennant and CTCHFL of sharing a vendor's bids with other vendors, a practice the town architects considered unethical. *Id.* at 52. Tennant claims these practices were "by-the-book" and that all he and CTCHFL were doing was "purchasing aggressively." *Id.* at 53. Additionally, during this same period of time, Tennant made statements criticizing Alys Beach Construction, an affiliate of EBSCO, and its work on a project in Alys Beach. ECF No. 34-1 at 3, 6; ECF No. 35-1 at 2; ECF No. 37-2 at 22 (Dep. at 197).

On or around August 24, 2011, CTCHFL was removed from the Alys Beach approved builders list. ECF No. 37-3, Ex. 17. Prior to informing CTCHFL about its removal from the list, Comer told Stephens that CTCHFL had been removed. ECF

No. 34-1 at 8-9. Either that same day or soon thereafter, Stephens notified CTCHFL that it was no longer his builder "based upon [its] removal from the approved builders list at Alys Beach." ECF No. 34-1 at 9; ECF No. 35-1 at 5; ECF No. 37-2 at 41 (Dep. at 273). This was Tennant's first knowledge that CTCHFL had been removed from the approved builders list. ECF No. 34-1 at 9; ECF No. 35-1 at 5; ECF No. 47-1 at 5. Tennant later received a letter from Comer dated August 24, 2011 via email informing him that CTCHFL has been removed from the approved builders list. ECF No. 37-3, Ex. 17. According to the letter, CTCHFL was removed for a number of reasons, including "the manner in which [CTCHFL] was competing for Alys Beach business" and Tennant's "false comments regarding [EBSCO's] business practices and the overall management of the community." ECF 34-1 at 6.

Generally, Tennant's fee arrangement for his Alys Beach projects was cost plus a percentage. ECF No. 37-1 at 12 (Dep. at 41). In Tennant's experience, the industry standard markup for a project similar to Stephens's Home is 15-percent, comprised of 10-percent overhead and 5-percent profit. ECF No. 37-1 at 16 (Dep. at 57-58). CTCHFL typically charges 15-percent for similar projects. ECF No. 37-2 at 43 (Dep. at 278). Tennant is "familiar with the size, design, and level of finishes that the Stephens were seeking in their preconstruction planning." ECF No. 47-1 at 5. Tennant is "familiar with the conceptual construction budget that the Stephens were planning for their project" and "familiar with the costs of construction in and

around the time frame of the Stephens project, for similar beach house residences in the general geographic vicinity of the Stephens project." *Id*. CTCHFL estimated Stephens's Home at 5,000 square feet and a cost of at least $2,000,000. ECF No. 36-2 at 14 (Ex. 4). The draft contract Tennant sent to Stephens on July 13, 2011 contained a cost plus a 14-percent contractor fee method of pricing. ECF No. 47-1 at 9. CTCHFL calculated its lost profits on Stephens's Home by multiplying a 15-percent markup by the minimum $2,000,000 estimated cost of the project, for a total of $300,000. ECF No. 36-2 at 19 (Ex. 4).

## MOTION TO STRIKE

Defendants argue that portions of the Declaration of Christian Tennant ("Tennant's Declaration"), ECF No. 43-1, which was filed by CTCHFL in support of its opposition to Defendants' Motion for Summary Judgment, ECF No. 33, contain (1) inadmissible hearsay, (2) statements that contradict Tennant's deposition and CTCHFL's answers to interrogatories, and (3) speculates on matters outside Tennant's knowledge.[7] ECF No. 46. CTCHFL maintains that the Declaration should not be stricken because (1) the statements are admissible under various exclusions and exceptions to the rules against hearsay, (2) there are no

---

[7] Defendants argue that Tennant's Declaration should be stricken because the original copy, filed on October 24, 2016, was unsigned. ECF 43-1. Defendants' argument is moot because Plaintiff filed a signed copy of Tennant's Declaration with its Memorandum of Law in Opposition to Defendants' Motion to Strike on November 14, 2016. ECF 47-1. Therefore, Defendant's motion to strike Tennant's Declaration as unverified is due to be denied.

inconsistencies in Tennant's statements, and (3) Tennant has personal knowledge of the statements contained in his declaration. ECF No. 47.

## I.  Hearsay Objections

Defendants argue that paragraphs 13, 19, and 20 of Tennant's Declaration in ruling on Defendants' Motion for Summary Judgment as the paragraphs contain inadmissible hearsay and thus the Court should not consider them.  ECF No. 46. Generally, affidavits and deposition testimony used to support or oppose summary judgment motions must "be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." *Macuba v. Deboer*, 193 F.3d 1316, 1322-1323 (11th Cir. 1999).  Inadmissible hearsay "cannot be considered on a motion for summary judgment" unless the contents of the statements could be "reduced to admissible evidence at trial."  *Id*.  A statement containing hearsay is "reduced to admissible evidence at trial" if it falls within a hearsay exception or exclusion under the Federal Rules of Evidence. [8]  *Id*. at 1323-1324.

Paragraph 13 of Tennant's Declaration states, "[t]he Stephenses told me that they had selected CTCHFL as their builder and that all that remained was finalizing the written memorialization agreement."  ECF 47-1 at 3.  This statement constitutes hearsay as it is Stephens's out-of-court statement offered to prove that he had

---

[8] Unless otherwise indicated, all references to "Rule" are to the Federal Rules of Evidence.

selected CTCHFL as the builder for his new home.  ECF No. 43.  Paragraph 19 of Tennant's Declaration states, "Elton Stephens informed me during a telephone call that as a result of a communication he received from Jason Comer, Elton and his wife would not honor the agreement to build a new beach house with CTCHFL." *Id*. at 4.  This statement also constitutes hearsay as it is Stephens's out-of-court statement offered to prove that he decided not to use CTCHFL as a builder after a discussion with Comer. [9]  ECF No. 43 at 10.  Paragraph 20 of Tennant's Declaration states, "Elton Stephens told me that the communication consisted of Jason Comer informing him that CTCHFL had been removed from the Alys Beach approved builders list, and he further indicated that Jason Comer had persuaded him to not go forward with CTCHFL."  ECF No. 47-1 at 4.  Although Comer's statements to Stephens do not constitute hearsay, Stephens's statement to Tennant constitutes hearsay to the extent it is offered to prove that Comer persuaded Stephens to not use CTCHFL as a builder.[10]

---

[9] However, Stephens states in his declaration, "I made the decision that I did not want to proceed any further in discussions with Mr. Tennant regarding my beach house because, quite simply, I had previously decided that I wanted to use a builder that would be approved to build homes in Alys Beach."

[10] The statements qualify as an opposing party's statement under Rule 801(d)(2)(A) and Rule 801(d)(2)(C) because Comer is a defendant in an individual capacity and was also the Vice President of EBSCO at the time the statement was made.  ECF 34-1; ECF 37-2 at 273. Therefore, his statements to Stephens do not constitute hearsay.

Under Rule 803(3), statements otherwise inadmissible as hearsay are admissible to prove "the declarant's then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). However, before a statement can be admitted under Rule 803(3), a declarant's state of mind must be at issue. *T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 828 (11th Cir. 1991); *see also U.S. v. Samaniego*, 345 F.3d 1280, 1282 (11th Cir. 2003) ("the purpose of the exclusion from Rule 803(3) admissibility is 'to narrowly limit those admissible statements to declarations of condition-'I'm scared'-and not belief-'I'm scared because [someone] threatened me.'"") (citations omitted). Here, Stephens's intent to enter into a contract with CTCHFL is at issue. Paragraph 13 offers evidence that Stephens intended to hire CTCHFL prior to its removal from the approved builders list and is admissible for that purpose. *See KW Plastics v. U.S. Can Co.*, 130 F. Supp. 2d 1297, 1299 (M.D. Ala. 2001) (in an action for tortious interference with a business relationship, court found that customer's statements to plaintiff that it would receive a contract reflected customer's intent to enter into contract and also supported the argument that the customer was induced to act differently) (cited in *Metropolitan Life Ins. Co. v. Carter*, No. 3:04-CV-668-J32HTS, 2005 WL 2810699, at n.40 (M.D. Fla. Oct. 27, 2005) ("admitting in tortious interference with business relationship case, under Rule 803(3), statement by employee that another company's official told her that it planned to award her employer a particular contract")).

However, paragraphs 19 and 20 of Tennant's Declaration do not evidence Stephens's intent to enter into a contract with CTCHFL. Therefore, paragraphs 19 and 20 are not admissible and will not be considered in ruling on Defendants' Motion for Summary Judgment.

## II.     Contradictory Statements

Defendants also claim that paragraph 20 of Tennant's Declaration should be stricken because it contradicts Tennant's deposition testimony. As discussed above, paragraph 20 contains inadmissible hearsay. Therefore, the Court need not decide whether it contradicts Tennant's deposition testimony.

## III.     Speculative Statements

Defendants seek to strike a portion of Paragraph 24 of Tennant's Declaration. Paragraph 24 states, "[n]onetheless, CTCHFL was unable to revive its business relationship with the Stephens, *presumably because of the pressures placed on the Stephens by Defendants*." Defendants argue that the italicized portion of paragraph 24 is inadmissible because it consists of speculative statements made without personal knowledge. ECF No. 43-1 at 5 (emphasis added). Plaintiff argues that personal knowledge may include inferences, and that Tennant's opinion was based on his own observations. ECF No. 47 at 11. Alternatively, Plaintiff argues that only a portion of the statement should be stricken. *Id.*

Affidavits and deposition testimony used to support or oppose summary judgment motions must "be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." *Macuba*, 193 F.3d at 1322. Under Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge on the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. The Advisory Committee Notes to Rule 602 state, "personal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception."[11] Fed. R. Evid. 602 advisory committee's note to 1972 proposed rule.

In this case, Tennant was not a party to the conversation between Comer and Stephens. Tennant's personal knowledge regarding the conversation and alleged pressure placed on Stephens by Defendants is limited to Stephens's statements to Tennant. As discussed above, Stephens's statements to Tennant are admitted for the limited purpose of establishing Stephens's state of mind but are not admitted for the truth of the statement. Therefore, Tennant lacks the requisite personal knowledge

---

[11] Federal district courts in Florida consider the Advisory Committee Notes accompanying the Federal Rules of Evidence when interpreting and applying the Rules. *See U.S. v. Cooper*, No. 15-CR-20042-JLK, 2015 WL 3819566, at *1 (S.D. Fla. June 18, 2015) (looking to the Advisory Committee Notes to identify the standard to determine the appropriateness of expert testimony); *Regions Bank v. Commonwealth Land Title Ins. Co.*, No. 11-23257-Civ., 2013 WL 3279939, at *1 (S.D. Fla. June 27, 2013) (notifying parties that parties experts "should be prepared to support any opinion with the proper foundation as set forth in the advisory committee's notes to the Federal Rules of Evidence"); *see also Browers v. Norfolk Southern Corp.*, 300 F. App'x. 700, 701 (11th Cir. 2008) (not an abuse of discretion for a Federal District Court in Georgia to consider factors enumerated in the Advisory Committee Notes to the Federal Rules of Evidence).

regarding any alleged pressures placed by Defendants on Stephens. Therefore, the portion of paragraph 24 of Tennant's Declaration which states, "[p]resumably because of the pressures placed on the Stephens by Defendants" is stricken. Defendants' Motion to Strike as to paragraph 24 will be granted and the Court will not considered the statements in ruling on the Motion for Summary Judgment.

## MOTION FOR SUMMARY JUDGMENT

### Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, "under the applicable substantive law, it might affect the outcome of case." *Hickson Corp., v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (internal citations omitted). A material dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying the portions of the record which support its position. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that no genuine disputes of material fact exist or by demonstrating that the nonmoving party has failed to present evidence in

support of an essential element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23. Once the movant has met its burden, the nonmoving party is then required "to go beyond the pleadings" and identify competent record evidence which shows the existence of a genuine, material factual dispute for trial. *Id*. at 324; *see also Johnson v. Gestamp Ala., LLC*, 946 F. Supp. 2d 1180, 1192 (N.D. Ala. 2013) (noting that "[o]nly evidence that is admissible on its face or that can be reduced to admissible form and that complies with Federal Rule of Civil Procedure 56(e) will be considered in deciding a motion for summary judgment"). In doing so, and to avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that [a] jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the non-movant "fails to properly address another party's assertion of fact" as required by Rule 56(c) of the Federal Rules of Civil Procedure, then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and the supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)&(3).

In determining whether to grant summary judgment, a court must be cognizant that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Accordingly, if there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true. *Id.* at 255. The court should "resolve all reasonable doubts about the facts in favor of the non-movant," *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir. 1990), and draw "all justifiable inferences" in that party's favor, *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* "The purpose of

summary judgment is to determine, on the basis of evidence that must be forthcoming, whether there is any dispute as to an issue of material fact, as distinguished from a party's mere allegations." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010 (1982). If the nonmoving party's claims consist of nothing "more than a repetition of [her] conclusional allegations," summary judgment is "not only proper[,] but required." *Id*.

## I. Tortious Interference with a Business Relationship (Counts I and II)

In order to establish a prima facie case of tortious interference with a business relationship, a plaintiff must establish (1) the existence of a business relationship, (2) knowledge of the business relationship on the part of the defendant, (3) an intentional and unjustified interference with the relationship by the defendant, and (4) damage to the plaintiff as a result of the breach of the relationship. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994).

In their Motion for Summary Judgment, Defendants argue they are entitled to summary judgment on Plaintiff's tortious interference with a business relationship claims against EBSCO and Comer on the grounds that (1) there is no evidence of a business relationship between CTCHFL and Stephens, (2) there is no evidence that CTCHFL's removal from the approved builders list caused Stephens to sever his business relationship with Plaintiff, (3) there is no evidence of an improper purpose, (4) Plaintiff cannot establish his damages, and (5) the affirmative defenses under the

economic privilege and economic loss doctrines are applicable. For the reasons discussed below, Defendants' Motion for Summary Judgment as to Counts I and II fail.

### A.    Business Relationship

In order to establish a business relationship, the plaintiff must show "an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen*, at 815. Although an enforceable contract is not required to establish a business relationship, the business relationship "must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen*, at 814 (quoting *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988)); *see Waste Servs. Inc. v. Waste Mgmt., Inc.*, 283 F. App'x. 702, 707-708 (11th Cir. 2008) (affirming district court's decision to grant defendant-appellees motion for summary judgment where parties' discussions "never moved beyond the discussion stage" and "proposed financing agreement was too inchoate to ever vest [plaintiff-appellant] … with prospective legal or contractual rights"). "A mere offer to sell, however, does not, by itself, give rise to sufficient legal rights to support a claim of intentional interference with a business relationship." *Landry v. Hornstein*, 462 So. 2d 844, 846 (Fla. 1985) (quoting *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So. 2d 769 (Fla. 4th DCA 1978)).

Defendants argue there is no evidence in the record establishing that CTCHFL had an understanding with Stephens "which in all probability would have been completed had the alleged interference not occurred" and that CTCHFL's conversations with Stephens "never moved beyond the discussion stage." ECF No. 33 at 12-13. The Court disagrees.

Viewing the evidence in the light most favorable to CTCHFL, the record shows that CTCHFL's discussions with Stephens began in or around December 2010. ECF No. 37-2 at 41-42 (Dep. at 273-274); ECF No. 37-3, Ex. 38. CTCHFL's initial contact with Stephens was via email. ECF No. 37-3, Ex. 38. The email introduced Tennant, indicated that he was interested in working with Stephens in building his new home, and provided a portfolio of CTCHFL's work. *Id.* Stephens responded on January 4, 2011 stating that he "would welcome the opportunity to talk to you. I have admired the houses you have done in Seagrove … we can get together in Feb [sic] or Mar. [sic]." *Id.* On June 11, 2011, Stephens emailed Tennant requesting CTCHFL's references. ECF No. 37-3, Ex. 39. In June 2011, Stephens told Comer that he had decided to use CTCHFL as his builder.[12] ECF No. 35-1 at

---

[12] In his declaration, Stephens qualifies his statement that he had selected CTCHFL as his builder by claiming he "did not mean that any final decision had been reached." ECF 35-1 at 4. "Instead, I meant to convey that [he] had decided [he] definitely would not use Alys Beach Construction because [he] did not want to get involved in the process with my family. [He] wanted to avoid any further discussions with my nephew and others regarding whether [he] would use Alys Beach Construction for the project." *Id.* There are issues of credibility regarding Stephens's statements given Stephens's prior role as Director of an affiliate of EBSCO and his familial relationship with Comer. It is not the Court's role to weigh conflicting evidence or to make

3-4. Additionally, on June 16, 2011, Stephens sent an email to Tennant with the subject "TEAM MEETING" requesting Tennant to attend a meeting at Stephens's house in Birmingham, Alabama on July 12, 2011. ECF No. 37-2 at 37 (Dep. at 255); ECF No. 37-3, Ex. 40. Gary Justiss, Stephens's architect, Alys Protzman, Stephens's interior designer, and Leslie Stephens, Stephens's wife, were copied on this email. ECF No. 37-2 at 39 (Dep. at 262-263); ECF No. 37-3, Exs. 40, 43. Tennant attended the "team meeting" in July 2011. ECF No. 37-2 at 39 (Dep. at 263-264). During the meeting, Stephens discussed the drawings in detail with the team members. ECF 37-2 at 37 (Dep. at 255). Stephens also pointed out the features he liked about his home in Alabama. *Id*. On July 13, 2011, Tennant emailed Stephens a contract. ECF No. 37-3, Ex. 41. The following day, Stephens notified Tennant that he would not be able to review the contract until after August 3rd because he was traveling and also stated "I JUST HOPE WE GET THE DAMN PERMIT. THANKS FOR FOLLOWING UP WITH TERRY ANDERSON." *Id*. As of August 16, 2011, CTCHFL was involved in preliminary discussions with engineers and architects regarding permitting and surveying. ECF No. 37-3, Ex. 42. Approximately one week later, on August 24, 2011, Stephens notified CTCHFL that CTCHFL was no longer his builder "based upon [its] removal from the approved

---

credibility determinations for purposes of deciding a motion for summary judgment and all inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

builders list at Alys Beach." ECF No. 35-1 at 5; ECF No. 37-2 at 41 (Dep. at 273). Viewed in the light most favorable to the Plaintiff, these facts raise a genuine and material issue regarding whether a business relationship existed between Plaintiff and Stephens.

### B. Knowledge

Defendants admit knowledge of the discussions between CTCHFL, Tennant, and Stephens in their Motion for Summary Judgment. "I was aware during the summer of 2011 that Mr. Stephens was in discussions with [CTCHFL] to construct his beach house." ECF No. 34-1 at 8; *see also* ECF No. 33 at 6-7. Therefore, there is sufficient evidence in the record to support Defendants' knowledge of the business relationship between CTCHFL and Stephens.

### C. Intentional and Unjustified Interference

Defendants argue summary judgment is appropriate because CTCHFL cannot establish that Defendants acted with an improper purpose. ECF No. 33 at 16. Defendants claim that their decision to remove CTCHFL from the approved builders list was for legitimate business reasons related to Alys Beach. *Id.* Defendants also claim that they only provided truthful information to Stephens, i.e. that Plaintiff was removed from the approved builder list, which cannot support a malicious purpose. *Id.* at 17.

To establish an intentional and unjustified interference with a business relationship, a plaintiff must show that "the defendant acted without justification …[;] [t]his is a fact-intensive inquiry that requires 'an examination of the defendant's conduct, its motive, and the interests it sought to advance.'" *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1280 (2015) (citation omitted). Actions taken to protect one's financial and business interests are not actionable so long as improper means are not employed. *Ethyl Corp. v. Batler*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980). Actions do not constitute an intentional and unjustified interference if they were taken in lawful protection of a legitimate interest and not solely out of malice. *Id.* at 1226. Merely providing truthful information to a third party does not amount to an intentional and unjustified interference with a business relationship. *Cherestal v. Sears Roebuck & Co.*, No. 6:12-cv-1681-Orl-28TBS, 2014 WL 644727, at *4 (M.D. Fla. Feb. 19, 2014). "Without direct evidence of malicious intent, malice can only be shown 'by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.'" *Id*. (citation omitted).

In this case, the Stephenses wanted to construct a single-family beach home on a plot of land located outside the physical boundaries of Alys Beach. ECF No.

35-1 at 2; ECF No. 47-1 at 3.  Neither party has argued that Alys Beach's approved

builders list was binding or recorded on property located outside the boundaries of

Alys Beach.  Comer knew that Stephens was interested in working with a builder

approved to build in Alys Beach.  ECF No. 34-1 at 8.  Relationships between EBSCO

and Tennant were strained.  ECF 37-1 at 51.  At some point during CTCHFL's

inclusion on the approved builders list, the town architects at Alys Beach accused

Tennant and CTCHFL of unethical bidding practices.  *Id*. at 52.  Tennant claims

these practices were "by-the-book" and all they were doing is "purchasing

aggressively."  *Id*. at 53.  During this time, Tennant made statements criticizing Alys

Beach Construction, a subsidiary or affiliate of EBSCO, and its work on a project in

Alys Beach.  ECF No. 34-1 at 3; ECF No. 35-1 at 2; ECF 37-2 at 22 (Dep. at 197).

On or about August 24, 2011, Comer contacted Stephens to notify him that

EBSCO had removed CTCHFL from the approved builders list.  ECF No. 33 at 8;

ECF No. 35-1 at 5.  Tennant first learned that CTCHFL was removed from the

approved builders list from Stephens, not Comer or EBSCO.  ECF No. 34-1 at 9;

ECF No. 35-1 at 5; ECF No. 47-1 at 4.  It is undisputed that Stephens's decision to

end discussions regarding using CTCHFL as a builder was based upon the removal

of CTCHFL from the approved builders list at Alys Beach. ECF No. 35-1 at 5.

Tennant received a letter from Comer dated August 24, 2011 via email informing

him that CTCHFL had been removed from the approved builders list due to its

"professional relationship with Alys Beach. … I had hoped that you would change your tune and be a positive voice for Alys Beach. But instead, things have become quite bad." ECF No. 37-3, Ex. 17.

In totality, these facts raise a genuine and material dispute regarding Comer's intent when he made the call to Stephens on or about August 24, 2011 to inform him that CTCHFL had been removed from the approved builders list. Although the information regarding CTCHFL's removal from the approved builders list was true, there is a material question regarding Comer's purpose in notifying Stephens. A jury could imply a malicious purpose from the fact that Comer notified Stephens before he notified CTCHFL. There is no evidence in the record suggesting that the approved builders list controlled construction on property located outside of Alys Beach. Comer knew that Stephens wanted a builder who was approved in Alys Beach and it is not unreasonable to infer that he wanted to contact Stephens before Stephens finalized any commitment with CTCHFL. Further, the relationship between EBSCO and CTCHFL was clearly strained by August 2011 and a jury could also infer that Comer's communication to Stephens was motivated by malice, i.e. in retaliation for CTCHFL's criticisms of Alys Beach Construction. Also, the Declaration of Covenants in effect at the time of CTCHFL's removal from the approved builders list stated that failure to comply with constructing regulations could result in the revocation of the right to build in Alys Beach. ECF No. 37-3 at

65. Comer states in his declaration that EBSCO's decision to remove CTCHFL from the approved builders list was for a number of reasons including the manner in which CTCHFL was competing for Alys Beach business and Tennant's persistently negative and false comments regarding EBSCO's business practices and the overall management of the community. ECF 34-1 at 6. These reasons do not appear to relate to Alys Beach construction regulation compliance.

In addition, there is a genuine issue of material fact as to the discussions Comer had with Stephens on or around August 24, 2011. In *Cherestal*, plaintiff worked at Luxottica, an optical store located within Sears Roebuck & Co.'s store. 2014 WL 644727, at *1. A Sears loss prevention employee observed plaintiff shopping while she was clocked in at Luxottica. *Id*. After she purchased items from Sears and walked out of the store, the loss prevention employee stopped the plaintiff and examined the items in her possession and compared them to the items listed on her receipt. *Id.* He determined that the plaintiff had an extra shirt that was not accounted for on the receipt and brought her to the loss prevention office. *Id*. After the plaintiff's behavior was investigated, the loss prevention employee told the plaintiff's manager that "he would prefer that [plaintiff] no longer worked in that store." *Id*. at *2. Plaintiff sued Sears on the grounds that it tortiously interfered with her business relationship with Luxottica. *Id*. at *1. On Sears' motion for summary judgment, the court found that although the loss prevention employee's

> actions of providing Luxottica with truthful information were justified, his statement that he would prefer that [plaintiff] not work at the store is another matter. By giving such an opinion, he was not simply reporting truthful information. A jury could reasonably determine that this statement and any other similar statements that Mr. Cabrera made were unjustified. An issue of material fact remains regarding justifiability.

*Id.* at \*5. Here, the strained relationship between Comer, EBSCO and Tennant, the timing of Comer's conversation with Stephens, and the fact that Stephens's Home was located outside Alys Beach are all facts on which a jury reasonably could rely in finding that Comer's conversation with Stephens was motivated by an improper purpose. Therefore, a genuine issue of material fact exists regarding whether Defendants' conduct amounted to an intentional and unjustified interference with a business relationship.

### D. Damages

Defendants argue that Plaintiff's claims for tortious interference with a business relationship fail because he cannot establish his damages with a reasonable degree of certainty. ECF No. 33 at 20-21. Plaintiff claims $300,000 in lost profits with respect to the Stephens contract, $1,500,000 in lost profits attributable to other potential customers, $5,000,000 in general lost business and good will, and $100,000 in marketing and other out of pocket expenses. ECF No. 36-2 at 19 (Ex. 4). In responding to Defendants' Motion for Summary Judgment, Plaintiff has only offered

evidence of a business relationship with Stephens. Therefore, only Plaintiff's lost profits on the Stephens contract are considered in this Order.

Defendants are correct in nothing that in Florida, "[t]he general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss." ECF No. 33 at 19 (quoting *Levitt-ANSCA Towne Park P'ship v. Smith & Co., Inc.*, 873 So. 2d 392, 396 (Fla. 4th DCA 2004). However, as long as the damages are substantial, as opposed to merely nominal, and are not "based on mere speculation or conjecture," lost profits suffered as a result of the wrong will not prevent recovery because of difficulty in proving them or uncertainty as to their amount. *James Crystal Licenses, LLC v. Infinity Radio, Inc.*, 43 So. 3d 68, 73 (Fla. 4th DCA 2010) (internal marks omitted). In order to establish lost profits, a plaintiff must point to "some standard, such as regular market values, or other established data, by reference to which may be satisfactorily ascertained." *Massey-Ferguson, Inc. v. Santa Rosa Tractor Co., Inc.*, 415 So. 2d 865, 867 (Fla. 1st DCA 1982) (court noted there was not a total absence of evidence to support lost profits where parties submitted projected sales figures and financial statements disclosing operating costs of business and profits); *see also Conner v. Atlas Aircraft Corp.*, 310 So. 2d 352, 354 (Fla. 3d DCA 1975) ("[i]nability to give the exact or precise amount of damages does not preclude recovery so long as there is a reasonable basis in the evidence …").

Although Defendant is correct that Plaintiff does not have expert testimony on the issue of damages, Tennant's lay witness testimony concerning his experience in the construction industry and lost profits on the Stephens project creates a genuine issue of material fact regarding damages.[13] ECF No. 33 at 20. Tennant has 26 years experience in homebuilding. ECF No. 37-1 at 3 (Dep. at 7). Tennant's fee arrangement for his Alys Beach projects was cost plus a percentage. *Id*. at 12 (Dep. at 41). Tennant testified during his deposition that the industry standard markup is 15-percent, comprised of 10-percent overhead and 5-percent profit, and that is his typical fee for projects similar to Stephens's build. ECF No. 37-1 at 16 (Dep. at 57-58); ECF No. 37-2 at 43 (Dep. at 278). Tennant is "familiar with the size, design, and level of finishes that the Stephenses were seeking in their preconstruction planning." ECF No. 47-1 at 5. Tennant is "familiar with the conceptual construction budget that the Stephens were planning for their project" and "familiar with the costs for construction in and around the time frame of the Stephens project, for similar beach house residences in the general geographic vicinity of the Stephens project."

---

[13] Under Rule 701, lay witnesses are permitted to testify in the form of an opinion if the witness's testimony is (1) based upon his perception, (2) helpful to understanding the witness's testimony or in determining a fact in issue, and (3) not based on scientific, technical, or other specialized knowledge …". *See Geter v. Galardi South Enterprises, Inc.*, No. 14-21896-CIV, 2015 WL 2155721, at *4 (S.D. Fla. May 7, 2015) (CPA who performed basic arithmetic that did not require any scientific, technical, or other specialized expertise permitted to testify as a lay witness as to his computations of damages) *Mortgage Now, Inc. v. Bryan Stone*, 3:09-CV-80-MCR-CJK, 2014 WL 4478950, at *10 (N.D. Fla. Sept. 20, 2012) (lay witness permitted to testify based on his experience in the industry regarding damages).

*Id*. In its response to Defendants' interrogatories, CTCHFL states that Stephens's Home was estimated at 5,000 square feet, and a cost of at least $2,000,000. ECF No. 36-2 at 2, 14. The draft contract Tennant sent to Stephens on July 13, 2011 contained a cost plus 14-percent contractor fee method of pricing. ECF No. 47-1 at 9. CTCHFL calculated its lost profits by multiplying the 15-percent markup by the minimum $2,000,000 estimated cost, for a total of $300,000.[14] ECF No. 36-2 at 19. Given Tennant's experience in the construction industry and his knowledge of CTCHFL's manner of profit making, he is able to testify to CTCHFL's lost profits on this single contract. Accordingly, Defendants' request for summary judgment on damages will be denied.

### E.   Economic Privilege Doctrine

Defendants argue that CTCHFL does not have a valid claim for tortious interference because EBSCO's decision to remove it from the approved builders list was done to protect its own economic interest. ECF No. 33 at 21-22. As mentioned above, actions taken to protect one's financial and business interests are not actionable so long as improper means are not employed. *Ethyl Corp.*, 386 So. 2d at

---

[14] The Court notes that Plaintiff's responses to Defendants' Interrogatories differ from the contract sent to Stephens on July 13, 2011, as the markup listed in the contract is 14-percent, compared to the 15-percent stated in Plaintiff's responses to Defendants' Interrogatories. Tennant acknowledged this discrepancy during his deposition: "Q Your interrogatory answer references a 15 percent markup. Why did you chose the number 15 percent? A That's my – projects of this size, that's my most typical fee. Q That wasn't the fee set forth in your draft agreement, was it? A I just noticed that myself. It says 14 percent in there." ECF No. 37-2 at 43 (Dep. at 278).

1225.  Although removing CTCHFL from the approved builders list is likely within Defendants' purview and covered by the economic privilege doctrine, communicating this decision to Stephens, whose project was outside Alys Beach, in retaliation for CTCHFL's criticisms of Alys Beach Construction is not privileged conduct.  As CTCHFL argues, "Defendants have put forth no evidence that would show how Comer's telephone call to Stephens protected EBSCO's financial interests."  ECF No. 43 at 21.  The Court agrees and thus summary judgment on this ground will be denied as well.

### F.    Economic Loss Doctrine

Defendants claim that Counts I and II are barred by the economic loss rule. As the Court previously found, the economic loss rule is limited to the products liability context in Florida and does not apply to the relationship between CTCHFL and Stephens.  ECF No. 28 at 8-9 (Order on Mot. to Dismiss).  To a large extent, Defendants have merely copied and pasted their economic loss argument from their Motion to Dismiss.  ECF No. 26 at 8-9; ECF No. 33 at 22-23.

Based on the discussion above, there is a genuine issue of material fact as to Plaintiff's claims of intentional interference with a business relationship against Defendants Comer and EBSCO.  Therefore, Defendants' Motion for Summary Judgment on Counts I and II will be DENIED.

## II.    Breach of Contract (Count IV)

Plaintiff's claim for breach of contract against EBSCO fails as a matter of law because there is no consideration supporting CTCHFL's alleged contract with EBSCO.  CTCHFL claims that it entered into a contract with EBSCO related to building outside Alys Beach.  ECF No. 43 at 23; ECF No. 47-1 at 2. "Pursuant to that agreement, CTCHFL was obligated to advertise, promote, and offer residential construction services in Alys Beach on condition of, and in exchange for, CTCHFL's right to be removed from the approved builder list only for cause." *Id*.  Defendants argue that CTCHFL's action for breach of contract fails because (1) there was no contract, (2) EBSCO did not breach any contract, (3) Plaintiff cannot establish its damages, and (4) the statute of frauds bars enforcement of the agreement, to the extent there was an agreement.  ECF No. 33 at 25-28.

In order to establish a prima facie case of breach of contract, a plaintiff must establish (1) offer, (2) acceptance, (3) consideration, and (4) sufficient specification of the essential terms.  *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004); *W.R. Townsend Contracting, Inc. v. Jensen Civil Const., Inc.*, 728 So. 2d 297, 302 (Fla. 1st DCA 1999).  "The consideration required to support a contract need not be money or anything having monetary value, but may consist of either a benefit to the promisor or a detriment to the promise.  It is not necessary that a benefit should accrue to the person making the promise.  It is sufficient that something of value

flows from the person to whom it is made, or that he suffers some prejudice or inconvenience and that the promise is the inducement to the transaction." *Lake Sarasota, Inc. v. Pan. Am. Sur. Co.*, 140 So. 2d 139, 142 (Fla. 2d DCA 1962).

In this case, EBSCO received no consideration in exchange for allowing CTCHFL to be included on the approved builders list. Plaintiff states that "pursuant to the agreement, CTCHFL was obligated to advertise, promote and offer residential construction services in Alys Beach on condition of, and in exchange for, CTCHFL's right to be removed from the approved builder list only for cause." ECF No. 43 at 23; ECF No. 47-1 at 2. Besides Tenant's own declaration and deposition testimony, the record contains no evidence supporting this claim and in fact the record suggests otherwise.

Tenant claims CTCHFL's contract with EBSCO was both written and verbal and that the written contract consisted of letters from EBSCO to CTCHFL dated October 14, 2005 and November 16, 2006. ECF No. 36-2 at 21-22 (Exs. 6, 7); ECF No. 37-1 at 24 (Dep. at 91). However, neither of these documents purport to obligate CTCHFL to do anything besides comply with Alys Beach's construction management rules. *See* ECF No. 36-2 at 21-22 (Exs. 6, 7). The October 14, 2005 letter simply welcomes CTCHFL to the Approved Builders list and includes a copy of Alys Beach Design Code and the Construction Management Guidelines and Agreement. *See* ECF No. 36-2 at 21 (Ex. 6). The Construction Management

Guidelines and Agreement only contain Alys Beach's rules for construction and do not obligate CTCHFL to "advertise, promote, and offer residential construction services in Alys Beach." The November 16, 2006 requested $75 from CTCHFL to cover administrative expenses pertaining to creating a portfolio to display its work to potential Alys Beach property owners and notifying CTCHFL that it would make the portfolio available to prospective buyers. *See* ECF No. 36-2 at 22 (Ex. 7). Besides the two letters, CTCHFL points to no record evidence in support of its statement that CTCHFL was obligated to "advertise, promote, and offer residential construction services in Alys Beach."

Indeed Tennant is speculating when he claims CTCHFL was obligated to offer residential construction services in Alys Beach:

> Q If you look at paragraph 60, the second amended complaint, it references a contract entered into, under which [CTCHFL] was obligated to advertise, promote and offer residential construction services. Do you see that allegation in paragraph 60?
>
> A Yes.
> …
>
> Q Was this a written or a verbal contract?
>
> A Both.[15]

---

[15]   Tennant testified that he was verbally told by Scott Henson that he was obligated to "advertise, promote, and offer residential construction services in Alys Beach" during a meeting he had with Mr. Henson in 2005.  ECF No. 37-1 at 24, 25 (Dep. at 90-91, 93).

Q Where is the written contract? What is the written contract?

A Well, part of it would be Exhibit 7.

Q Okay. Anything else, other than Exhibit 7?

A Exhibit 6

Q Anything else?

A There may be various emails discussing our approval, welcoming us to the community.
…

Q What emails?

A It's just *an assumption* at the time that there'd be correspondence with the town architects or whomever about being approved.

Q When did those e-mails occur? Or let me just ask you this: Are you juts assuming there were emails, or do you know there were?

A *I'm assuming.*

Q Are you able to identify any particular emails as you sit here today?

A No.

Q Where in Exhibit 6 does it say that [CTCHFL] is obligated to offer residential construction services in Alys Beach?

A: It's – to me, *it's implied in the approval.*
…

> Q: Do you contend that Tennant Florida was obligated to pursue projects within Alys Beach until all new construction was completed at some point in time in the future?
>
> A: I suppose a builder could ask to be removed from the builders' list, but yes, as long as you're on the list, *I believe you have an obligation.*
>
> Q: An obligation to do what?
>
> A: *Perform construction Services.*

ECF No. 37-1 at 24, 26 (Dep. at 97) (emphasis added). Exhibits 6 and 7 do not contain terms obligating CTCHFL to "advertise, promote, and offer residential construction services in Alys Beach." These documents contradict Tennant's testimony and demonstrate that his opinion about CTCHFL's obligation to offer construction services in Alys Beach is based on mere speculation.[16]

Where a party submits only an affidavit in opposition to a motion for summary judgment and the affidavit is a recital of unsupported allegations and is conclusory in nature, courts have found that it cannot create a genuine issue of material fact. *See Curl v. International Business Machines Corp.,* 517 F.2d 212 (5th Cir. 1975) (court found that where the plaintiff's affidavits were conclusory in nature and her

---

[16] ("Q: Under what circumstance could Tennant Florida decide it didn't want to be part of the list anymore? A If we decided to close operations, if we decided to retire, if we decided we wanted to – were too busy in other communities. … Q: If Tennant Florida decided it just didn't want to do any more business with the Alys Beach community, it could simply ask to be removed from the approve list, correct? A: I would think so, but I can't speak for them.") ECF No. 37-1 at 26 (Dep. at 97-98).

"proof" was the thinnest circumstantial evidence in contrast to defendant's voluminous proof, plaintiff failed to overcome defendant's motion for summary judgment);[17] *U.S. v. $705,270.00 in U.S. Currency*, 820 F. Supp. 1398 (S.D. Fla. 1993) (defendant failed to meet his burden on summary judgment where his affidavit was conclusory and contradicted by the record); *Discovery Sun P'ship, Ltd. V. Kapsomenakis*, No. 95-1068-CIV, 2000 WL 1881203 (S.D. Fla. June 21, 2000) (where witness testified that he observed defendant let himself fall down a flight a stairs, defendant's self-serving affidavit stating that his injuries were not a result of his own willful misconduct was insufficient to defeat a motion for summary judgment). As Tennant's deposition testimony demonstrates, his self-serving statements that CTCHFL was obligated to "advertise, promote, and offer residential construction services in Alys Beach" are conclusory and based on assumptions and speculation.

The record also shows that CTCHFL could "remove itself from the Approved Builder List at any time and for any reason." ECF No. 33 at 4.CTCHFL has not pointed to any section in the Declaration of Covenants that contains the requirement that approved builders must "advertise, promote, and offer residential construction services in Alys Beach." ECF No. 37-3 at 57 (Ex. 44). CTCHFL has put forward

---

[17] In the Eleventh Circuit, Fifth Circuit cases decide before October 1, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1213 (11th Cir. 1981).

no independent evidence that the multiple contracts that it entered into with Alys Beach property owners benefited anyone besides CTCHFL, Tennant, and the respective Alys Beach property owners.

In totality, these facts demonstrate that there is no genuine issue that EBSCO received no consideration in exchange for placing CTCHFL on the approved builders. In order to avoid summary judgment, CTCHFL "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that [a] jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). The Court notes that the section of CTCHFL's memorandum of law arguing that EBSCO breached a contract with CTCHFL only contains record cites to Tennant's Declaration and no other evidence. *See* ECF No. 43 at 23-25. Therefore, Plaintiff has failed to establish a prima facie case of breach of contract and Defendant EBSCO's Motion for Summary Judgment as to Count IV will be granted.

### III.    Breach of Implied Contract (Count VII)

CTCHFL's claim for breach of an implied contract, or quantum meruit[18], also fails for the same reasons its claim for breach of contract fails.  To establish breach of an implied contract, a plaintiff must show that (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant has knowledge of the benefit, (3) the defendant has accepted or retained the conferred benefit, and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.  *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997).  As discussed above, CTCHFL conferred no benefit to EBSCO as a result of being approved to build in Alys Beach.  Defendant EBSCO states correctly, "[i]f anything, [EBSCO] conferred a benefit on Plaintiff by permitting it to build in Alys Beach." ECF No. 33 at 30.  Therefore, Plaintiff has failed to establish a cause of action for breach of an implied contract and Defendant's Motion for Summary Judgment as to Count VII will be granted.

### IV.    Promissory Estoppel (Count VIII)

CTCHFL argues it has a claim for promissory estoppel because EBSCO allegedly breached its promise that CTCHFL would remain on the approved

---

[18] "Florida courts have … used [the] terms – 'quasi contract,' 'unjust enrichment,' 'restitution,' 'constructive contract,' and 'quantum meruit'" synonymously. *See Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997) (citations omitted).

builder's list so long as it undertook certain actions and met certain conditions. ECF No. 43 at 29. To establish a cause of action for promissory estoppel, a plaintiff must show that (1) the plaintiff detrimentally relied on a promise made by the defendant, (2) the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of the plaintiff, and (3) injustice can be avoided only by enforcement of the promise against the defendant. *W.R. Townsend Contracting*, 728 So. 2d at 302.

Here, CTCHFL points only to the Declaration of Covenants to argue that Defendant promised that it would remain on the approved builder's list. Tennant testified to the following at his deposition:

> Q: Is your testimony that a representative of [EBSCO] promised you that [CTCHFL] would remain on the approved builders' list for a certain period of time?
>
> A: I would say indefinitely, unless there was a problem.
>
> Q: When was that promise made?
>
> A: When they delivered us the – I would say when they recorded the declarations and covenants.
>
> Q: … Is your contention that the only place where a promise exists is within the declaration regarding how long you would remain an approved builder?
>
> A: I would say yes, and also as far as an industry and national and all reasonable business practices that exist.
> …

Q: So do you contend the Founder made any promises to you that you would remain on the approved builders' list indefinitely?

A: I contend it was implied, given, law as we said in the covenants.
…
Q: Did any representative of the Founder ever promise you that Tennant Florida would remain on the approved builders' list indefinitely?

A: Yes

Q: Who?

A: They wrote it down in the declarations.

Q: Is there any promise, other than what's in the declaration?

A: I guess I'm not a lawyer. To me, like I said, it's a given. Did they have to make a special promise? By omission, to me, that's a promise that they did not say refer to timeliness.
…

Q: Was there ever any conversation you had with any representatives of [EBSCO] where that representative stated that [CTCHFL] would remain on the approved builders' list for any particular period of time?

A: Nobody promised to mention that it would be forever.

ECF No. 37-1 at 20 (Dep. at 74-76). The Declaration of Covenants for the properties

at Alys Beach is intended to govern the rights and obligations between EBSCO and

*lot owners* in Alys Beach.[19]  ECF No. 37-3 at 58.  CTCHFL has not claimed that it

owned property in Alys Beach. According to the Declaration of Covenants in the

record,

> "Builders. Builders must be approved by the Founder
> before building in the Neighborhood. Approval shall be
> based on willingness to build in accordance with approved
> plans and specifications, quality of past work, client
> satisfaction and financial history. Builders must agree to
> comply with construction regulations, to dispose of
> construction debris properly and to build in accordance
> with the approved plans and specifications. Builders may
> be required to post a deposit for compliance and damages.
> Failure to comply may result in fines, forfeiture of the
> deposit and revocation of the right to build in the
> Neighborhood."

ECF No. 37-3 at 65.

Considering the purpose of the Declaration of Covenants, the intent for it to

be "binding upon all *owners* of property within this Neighborhood", and Tenant's

deposition testimony, the Court finds there is no genuine issue of material fact over

whether a promise was made to CTCHFL regarding the duration that it would remain

on the approved builders list.  ECF No. 37-3 at 58.  Therefore, Plaintiff has failed to

---

[19] The Declaration states, "6.3 Duration. The covenants and restrictions contained in this Declaration shall run with and bind the Neighborhood and shall inure to the benefit of and be enforceable by the Founder, the Neighborhood Association and its Board, and all Owners of property within the Neighborhood, their respective legal representatives, heirs, successors or assigns for twenty years …".  ECF 37-3 at 70.

establish a cause of action for promissory estoppel and Defendant EBSCO's Motion

for Summary Judgment as to Count VIII will be granted.

## V.    Injunctive Relief

Plaintiff argues that it is entitled to injunctive relief because EBSCO's breach

of its promise that CTCHFL would remain an approved builder constitutes a

violation of Plaintiff's right to enter building contracts within Alys Beach.  This

argument fails because Plaintiff had no right to enter into contracts within Alys

Beach.

In order to obtain a permanent injunction, a party must show (1) that he has

prevailed in establishing the violation of a right asserted in his complaint, (2) there

is no adequate remedy at law, and (3) irreparable harm will result if the court does

not order injunctive relief.  *Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010).

Here, Defendant, as the founder and conveyer of the properties in Alys Beach, has

the right to establish real covenants, including a covenant concerning who is

permitted to build within Alys Beach.[20]  The Declaration of Covenants states, "[t]he

covenants and restrictions … shall inure to the benefit of and be enforceable by the

---

[20] "A real covenant '*concerns the property conveyed* and the occupation and enjoyment thereof. …  If the performance of the covenant must touch and involve the land or some right or easement annexed and appurtenant thereto, and tends necessarily to enhance the value of the property or renders it more convenient and beneficial to the owner, it is a covenant running with the land'" *PGA North II of Fla, LLC v. Division of Admin., State of Fla. Dept. of Transp.*, 126 So. 3d 1150, 1152 (Fla. 4th DCA 2012) (citations omitted) (emphasis added).

Founder, the Neighborhood Association and its Board, and all Owners of property within the Neighborhood …". ECF No. 37-3 at 70. Plaintiff has neither argued that it owns property in Alys Beach nor pointed to any authority establishing its right to build in Alys Beach. Therefore, CTCHFL has no rights under the Declaration of Covenants.[21] CTCHFL has failed to establish the requisite elements for a permanent injunction and as a result Defendant EBSCO's Motion for Summary Judgment as to Plaintiff's request for injunctive relief will be granted.

Accordingly:

1. Defendants' Motion to Strike, ECF No. 46, is **GRANTED IN PART, DENIED IN PART.**

2. Defendants' Motion for Summary Judgment, ECF No. 33, is **GRANTED IN PART, DENIED IN PART**, as follows**:**

---

[21] In fact, the Declaration of Covenants does not provide rights to builders but rather restricts parties contracting rights by limiting who is permitted to build in Alys Beach. "Unless a person is a party to a contract, that person may not sue … for breach of that contract where the non-party has received only an incidental or consequential benefit of the contract." *Morgan Stanley DW Inc. v. Halliday*, 873 So. 2d 400, 403 (Fla. 4th DCA 2004) (footnote omitted). Even assuming Defendant EBSCO breached its promise to retain approved builders unless removed for cause, Plaintiff has no right to sue for breach of contract relating to the Declaration of Covenants because it is a party whose benefits, i.e. being permitted to build within Alys Beach, stemming from the Declaration of Covenants are merely incidental. The purpose of the Declaration of Covenants is to provide notice to *owners*, and not the builders, of rules and requirements of Alys Beach. In fact, the record shows that when CTCHFL was added to the Approved Builder's list on October 14, 2005, EBSCO included a "Construction Management Guidelines and Agreement" document and not the Declaration of Covenants. ECF 36-2, Ex. 6.

     a. DENIED as to Counts I and II (Tortious Interference with a Business Relationship).

     b. GRANTED as to Count IV (Breach of Contract as to EBSCO).

     c. GRANTED as to COUNT VII (Breach of an Implied Contract as to EBSCO).

     d. GRANTED as to COUNT VIII (Promissory Estoppel as to EBSCO).

     e. GRANTED as to the request for Injunctive Relief.

3. Trial will be scheduled by separate order. Additionally, the parties will be referred to the magistrate judge for a final settlement conference.

     **DONE AND ORDERED** this 15th day of September, 2017.


*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**